UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E. CHILDS,<br><br>        Plaintiff,<br><br>    v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>        Defendants. | No. 2:13-cv-0670-TLN-EFB P<br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983. Currently pending is defendants' motion for summary judgment and plaintiff's motion for a temporary restraining order. ECF Nos. 78, 93. For the following reasons, it is recommended that the motion for a temporary restraining order be denied and that the motion for summary judgment be denied in part and granted in part.

**I.    Plaintiff's Motion for a Temporary Restraining Order**

Plaintiff has submitted a "motion to get help or have the court's look into an emergency issue" (ECF No. 93) in which he alleges that he is being subjected to beatings, transfers, and other harassment due to his pursuit of this case. The motion states, in its entirety,

> I would like to have an emergency temporary injunction under section 1983 and while this action is still in motion.
>
> I have been attacked by numerous of C/O's in CDCR. I am been [sic] harassed and beat over (7) times and transferred (3) times out of the prison for no reason

1

> then sent back to R.J.D. I have been threated [sic] and I'm under heavy duress where my life is in harm's way over this case #2:13-CV-00670. The C/O's here is writing me up and attacking me every time I come out my cell. I have lots of witnesses and I was beat today on 4-28-16 and I have medical reports and other things. I believe if the courts don't step in at this moment I am going to die.
>
> I have been told to drop this case. I am a mental patient and I don't know what to do. Could you please send a lawyer of anyone to investigate this. I filed and injunction [sic] twice on this.
>
> Action: I need the courts to step in and help and force the CDCR C/O's to stop using excessive force on me for having a right to have access to the courts. Also have someone talk to me and grant me a lawyer just to help get let me out of ASU (hole) [sic].
>
> Also have this place give me my legal mail.
>
> HELP!

ECF No. 93 at 1-2. Appended to the motion is a CDCR form entitled "Medical Report of Injury or Unusual Occurrence" dated April 28, 2016 documenting two abrasions and one swollen area on plaintiff. *Id.* at 3. The nurse who prepared the form wrote that plaintiff said, "I been attacked multiple times due to ongoing case against CDCR" and "I been attacked by Sgt. [illegible name]." *Id.*

   A temporary restraining order may be issued upon a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The purpose of such an order is to preserve the status quo and to prevent irreparable harm "just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974). "The standards for granting a temporary restraining order and a preliminary injunction are identical." *Haw. County Green Party v. Clinton*, 980 F. Supp. 1160, 1164 (D. Haw. 1997); *cf. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (observing that an analysis of a preliminary injunction is "substantially identical" to an analysis of a temporary restraining order).

   A preliminary injunction will not issue unless necessary to prevent threatened injury that would impair the court's ability to grant effective relief in a pending action. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984); *Gon v. First State Ins. Co.*, 871

1   F.2d 863 (9th Cir. 1989). A preliminary injunction represents the exercise of a far reaching
2   power not to be indulged except in a case clearly warranting it. *Dymo Indus. v. Tapeprinter, Inc.*,
3   326 F.2d 141, 143 (9th Cir. 1964). In order to be entitled to preliminary injunctive relief, a party
4   must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable
5   harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an
6   injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir.
7   2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d
8   249 (2008)). The Ninth Circuit has also held that the "sliding scale" approach it applies to
9   preliminary injunctions—that is, balancing the elements of the preliminary injunction test, so that
10  a stronger showing of one element may offset a weaker showing of another—survives *Winter* and
11  continues to be valid. *Alliance for the Wild Rockies v. Cottrell*, 622 F.3d 1045, 1050 (9th Cir.
12  2010). "In other words, 'serious questions going to the merits,' and a hardship balance that tips
13  sharply toward the plaintiff can support issuance of an injunction, assuming the other two
14  elements of the *Winter* test are also met." *Id*. In cases brought by prisoners involving conditions
15  of confinement, any preliminary injunction "must be narrowly drawn, extend no further than
16  necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive
17  means necessary to correct the harm." 18 U.S.C. § 3626(a)(2).

18          Plaintiff's motion does not meet this standard. It addresses conduct that is not a subject of
19  this action, and therefore fails to demonstrate either a likelihood of success on the merits or a
20  serious question on the merits. Generally, such allegations must be pursued through the prison
21  administrative process and then litigated in a separate action. *See McKinney v. Carey*, 311 F.3d
22  1198, 1199-1201 (9th Cir. 2002) (per curiam) and *Rhodes v. Robinson*, 621 F.3d 1002, 1004-07
23  (9th Cir. 2010) (together holding that claims must be exhausted prior to the filing of the original
24  or supplemental complaint); *Jones v. Felker*, No. CIV S-08-0096 KJM EFB P, 2011 U.S. Dist.
25  LEXIS 13730, at *11-15 (E.D. Cal. Feb. 11, 2011).

26          The court does have some authority to intervene regarding conduct unrelated to the
27  complaint under The All Writs Act. That Act gives federal courts the authority to issue "all writs
28  necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and

principles of law." 28 U.S.C. 1651(a). The United States Supreme Court has authorized the use of the All Writs Act in appropriate circumstances against persons who, "though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *United States v. N.Y. Tel. Co.*, 434 U.S. 159 (1977). To obtain an order under the All Writs Act, the requested order must be "necessary." This language requires that the relief requested is not available through some alternative means. *Clinton v. Goldsmith*, 526 U.S. 529 (1999).

Plaintiff's statements that he is mentally ill, is being beaten, and has been deprived of his legal papers raised cause for concern. Accordingly, the court directed defense counsel to file a response to these allegations so that the court may evaluate whether an order under the All Writs Act is necessary. ECF No. 95. Counsel filed such a response on June 26, 2016 (ECF No. 96), and has provided the court with evidence that plaintiff is regularly sending and receiving legal mail and has been granted priority law library user status on many occasions so that he can prepare court filings. *Id.*, Exs. 6 & 7. Counsel also provided evidence that plaintiff is being provided mental health care and has been transferred for legitimate reasons. *Id.*, Exs. 1-4. Lastly, counsel provided evidence of an altercation between plaintiff and two correctional officers on April 28, 2016, that could have caused the injuries reported on the form submitted by plaintiff. *Id.*, Ex. 8. The officers documented that plaintiff had become combative during an escort and pulled both escorting officers to the ground. *Id.* Plaintiff has failed to provide further evidence from which the court can evaluate the allegations leveled in his motion.

On the record before the court, the court cannot conclude that plaintiff is being subjected to retaliatory beatings and transfers and being deprived of mental health treatment and access to legal materials. In other words, the evidence does not show that the order requested by plaintiff is necessary and thus relief is not warranted under the All Writs Act.

**II.     The Parties' Factual Assertions**

**A. The Complaint**

This case proceeds on the verified amended complaint filed November 15, 2013. ECF No. 16. In its order screening that complaint, the court found that plaintiff had stated potentially

4

1  cognizable claims against defendants Ramirez, Dichoso, Imhoff, Nahavandi, Tapiz, Jones,
2  Brown, and Nelson for violation of the Eighth Amendment. ECF No. 19.  Plaintiff alleges the
3  following facts:
4      At all times relevant to this action, plaintiff was housed at California Medical Facility,
5  Vacaville ("CMF-Vacaville") in unit I-3, an administrative segregation unit for mentally ill
6  inmates. ECF No. 16 at 7.  On March 11, 2013, plaintiff began a hunger strike along with fellow
7  I-3 inmate Bell.  *Id.*  Defendant Ramirez, a correctional officer working in I-3, granted plaintiff's
8  request that he sign an administrative form documenting the beginning of the hunger strike.  *Id.*
9      On March 14, 2013 at around 9:30 a.m., defendant Ramirez and fellow officer defendant
10 Dichoso placed plaintiff in waist restraints, and Dichoso escorted plaintiff to a prison medical
11 clinic.  *Id.* at 7-8.  Plaintiff was briefly seen by registered nurse Rojas.  *Id.* at 8.  After waiting at
12 least 45 minutes to see a doctor, plaintiff asked to be taken back to his cell.  *Id.*  Dichoso returned
13 plaintiff to his cell and asked Ramirez to lock the door.  *Id.* at 9.  Ramirez locked the door and
14 asked plaintiff if he had ended his hunger strike.  *Id.*  Plaintiff replied, "No."  *Id.*  Ramirez closed
15 the food port (through which waist restraints are applied and removed) and told plaintiff he would
16 not remove the restraints until plaintiff ended the strike.  *Id.*
17     Plaintiff saw defendant Nahavandi, another correctional officer, from his cell window
18 talking to another I-3 inmate.  *Id.*  Nahavandi came to plaintiff's cell, where plaintiff told her that
19 Ramirez and Dichoso had left him in waist restraints.  *Id.*  Nahavandi told plaintiff to talk to
20 Ramirez and walked away.  *Id.*  Inmate Miller, in another cell, asked plaintiff what was going on,
21 and plaintiff told Miller that Ramirez and Dichoso had left him in restraints because of his hunger
22 strike.  *Id.*
23     Plaintiff asked defendant Tapiz, another officer on duty, to come to his cell, but Tapiz
24 responded that he was not getting in plaintiff's "mix."  *Id.* at 9-10.  Inmate Miller told Tapiz that
25 Ramirez had left plaintiff in restraints, and Tapiz responded that he knew.  *Id.* at 10.  Defendant
26 Imhoff, a correctional lieutenant, entered I-3 and walked the tier.  *Id.*  Plaintiff called to Imhoff,
27 who asked whether plaintiff was ready to eat.  *Id.*  Plaintiff said no, and Imhoff responded, "Then
28 /////

5

the restraints stay on." *Id.* Nahavandi walked the tier every 30 minutes, but ignored plaintiff's calls for help. *Id.*

Around 3:15 in the afternoon, plaintiff called out to defendant Jones, a correctional officer walking the I-3 tier. *Id.* at 11. Plaintiff showed Jones that he was still in restraints and asked Jones to remove them. *Id.* Jones replied that he could not remove the restraints and that Ramirez had told him what was "going on." *Id.* Jones told plaintiff that the log book was "messed up" because Ramirez and the other officers on the prior shift left "without making sure the restraints wasn't put up [sic]." *Id.* Another correctional officer, defendant Brown, later walked the tier. *Id.* Plaintiff called to Brown, but Brown ignored him. *Id.* Later, Jones told plaintiff that, because of the restraints, he would pass him up for showers and say that plaintiff had refused. *Id.* at 11-12. Jones said he could not help plaintiff because Ramirez was "his boy." *Id.* at 12.

At 4:30 p.m., plaintiff again asked Jones and Brown to remove the restraints because the cuffs were tight. *Id.* They ignored plaintiff. *Id.* Both officers continued to ignore plaintiff's requests for help for the rest of the shift. *Id.* As the night shift began, plaintiff waited for other officers to arrive, but became tired. *Id.* at 12-13. He tried to lie down but the restraints made it hard to sleep. *Id.* at 13. It was hard to cover himself and he fell off the bunk three times, which hurt his hands, wrists, and lower back. *Id.* His wrist swelled, bruised, and became sore. *Id.* He tried to sleep on the floor but it was cold and painful. *Id.* Getting up off the floor was also hard. *Id.* The combination of the restraints with plaintiff's jumpsuit made it hard to urinate, and plaintiff urinated on himself. *Id.* Plaintiff "didn't have a bowel movement because of the circumstances." *Id.* at 14. Plaintiff laid on the floor in pain and very cold all night. *Id.*

Plaintiff woke up around 7 a.m. the next day (March 15, 2013) in a lot of pain. *Id.* Defendant Nahavandi was passing out breakfast. *Id.* She looked into plaintiff's cell and asked him if he was going to eat. *Id.* Plaintiff came to his cell door and begged Nahavandi to remove the restraints because he was in a lot of pain. *Id.* Nahavandi just walked away. *Id.* Plaintiff asked defendant Tapiz to remove the restraints, but he refused. *Id.* Another I-3 inmate, Noriega, also asked Tapiz to remove the restraints but was rebuffed. *Id.* Noriega told plaintiff that inmate Bell had been asking all the correctional officers to remove the restraints and that, because they

had refused, Bell had covered his cell window to induce the officers to remove him from his cell. *Id.* at 15-16. Plaintiff covered his window as best he could so that he would also be removed from his cell and given medical attention. *Id.* at 16. But the correctional officers working at the time (Nahavandi, Dichoso, and Tapiz) did nothing about the covered windows. *Id.*

Around 2:40 p.m., Bell started a fire in his cell. *Id.* Defendant Brown activated an alarm. *Id.* All CMF correctional officers and fire officials came to Bell's cell and told him to uncover his window. *Id.* Bell complied and was cuffed and placed in the "mental health cages." *Id.* The correctional officers then came to plaintiff's cell. *Id.* Defendant Brown called plaintiff three times, but plaintiff did not answer. *Id.* An officer opened plaintiff's food port and tried to remove the window covering; some of the covering came down. *Id.* at 16-17. Defendant correctional captain Nelson told plaintiff to uncover his window. *Id.* at 17. Plaintiff tried to comply but fell because the restraints tightened. *Id.* The officers (including Nahavandi and Brown) opened the cell door and "pended" plaintiff to the floor. *Id.* Nelson directed the officers to put plaintiff in the mental health cages next to Bell. *Id.* Nelson asked plaintiff "what was going on." *Id.* Plaintiff told him he had been left in restraints for 24 hours. *Id.* Nelson told Brown to remove the restraints but refused to allow plaintiff to see a nurse, even though plaintiff said he was in a lot of pain. *Id.* at 17-18.

### 1. **The Facts Presented by the Parties on Summary Judgment**

According to defendants, Dichoso placed plaintiff back in his cell on March 14, 2013 and removed the waist restraints. ECF No. 78-3, Defs.' Statement of Undisputed Facts (hereinafter "DUF") No. 22. Plaintiff disputes that Dichoso (rather than Ramirez) placed him back in his cell and that the restraints were removed. ECF No. 84 at 23-34, Pl.'s Response to DUF (hereinafter "Pl.'s Response") No. 22; ECF No. 84 at 36-48, Pl.'s Statement of Undisputed Facts (hereinafter "PUF") No. 32.

Defendants Brown and Jones, along with non-defendant officer Jordan, who worked on March 14, 2013, aver that plaintiff was not in waist restraints when he was offered a shower that day, which he refused. DUF No. 28. According to plaintiff, he was in restraints and Jones never offered him a shower. Pl.'s Response No. 28. Plaintiff states that Jones refused to remove the

7

restraints after plaintiff showed them to him and that Brown ignored plaintiff when plaintiff called to him. PUF Nos. 56, 57. Brown and Jones declare that plaintiff was not in restraints when offered dinner that night, and medical staff Garcia declares that plaintiff was not in restraints when he was offered his prescription medications that night. DUF Nos. 29, 31. All defendants and some other correctional staff who were on duty that day aver that they would have noticed if plaintiff had been left in waist restraints in his cell and would have acted to remove the restraints, because leaving an inmate in the restraints poses a security risk. DUF Nos. 24, 35. Plaintiff disputes all claims that he was not left in restraints. Pl.'s Response Nos. 22, 24, 29, 31, 35.

Non-party Officer Salazar worked in I-3 from 10 p.m. on March 14, 2013 to 6 a.m. on March 15, 2013. DUF No. 36. He conducted security checks on all inmates, including plaintiff, every hour and conducted inmate counts at approximately 12:30 a.m., 2:30 a.m., and 5 a.m. *Id.* If plaintiff had been in waist restraints, Salazar would have noticed and removed them. DUF No. 37. Defendants Tapiz, Dichoso, and Nahavandi, as well as non-defendant Officer Charles, worked in I-3 on March 15, 2013. DUF Nos. 38-40. One of the officers passed out breakfast trays at around 6:15 a.m.; the parties dispute whether plaintiff was given a tray (plaintiff declares he was still on hunger strike). DUF No. 41; Pl.'s Response No. 41.

Defendants have produced records indicating that plaintiff was offered medication at 8 a.m. on March 15th but refused it. DUF 42. A CMF nursing manager declares that, had plaintiff been in restraints when he was offered his medications, the nurse offering the medications would have noticed and contacted custody staff to address the issue. ECF No. 78-22 at ¶ 10. Nurses Magurah and Tan prepared a form indicating that plaintiff refused to be examined at 8 a.m. on March 15th. ECF Nos. 78-20, 78-21, 78-1 at 70. Both declare that, had plaintiff been in restraints at that time, they would have noticed. *Id.* Plaintiff disputes that he was offered and refused medication and a medical exam that morning and that he was not in restraints. Pl.'s Response Nos. 42-43.

Defendants' records show that plaintiff refused to go to the medical clinic later on March 15th for a medical exam related to his hunger strike. DUF 44; ECF No. 78-23 at 5; ECF No. 78-1

8

at 72-73, 77. The health worker who offered the exam, non-party psychiatric technician T. Mangalathil, does not believe that plaintiff was in restraints that day. ECF No. 78-23 ¶ 8. If plaintiff had been in restraints, Mangalathil would have noticed and alerted custody staff. ECF No. 78-23 ¶ 9. Plaintiff disputes that he refused to go to the clinic and that he was not in restraints. Pl.'s Response No. 44.

Defendants' evidence indicates that defendant Imhoff signed into I-3 at 8:45 a.m. on March 15th to discuss hunger strike issues with inmates. ECF No. 78-1 at 33. He does not remember which inmates he spoke to or how long he stayed. ECF No. 78-10 at ¶ 8. Imhoff does not remember walking the I-3 tier on March 14th as alleged by plaintiff. *Id.* at ¶ 6. The I-3 log does not bear any sign-in from Imhoff that day. ECF No. 78-1 at 31. Imhoff declares that, absent an emergency, he would not enter a unit and walk on the tier without signing in first. ECF No. 78-10, ¶¶ 4-6. Imhoff declares that he never saw plaintiff alone in his cell in waist restraints, and that, if he had, he would have acted to have them removed. *Id.* at ¶ 9. Plaintiff disputes these facts and states that Imhoff saw plaintiff in his cell in restraints on March 15th. Pl.'s Response No. 45.

Non-party Correctional Lieutenant J. Leon Guerrero visited I-3 three times on March 15th, first at 10:10 a.m. and then at 12:22 p.m. and 3 p.m. ECF No. 78-1 at 15, 33; ECF No. 78-14 at ¶¶ 8-9. Based on his review of various records, Guerrero believes that he interviewed plaintiff during his first visit to I-3 about plaintiff's hunger strike. ECF No. 78-14 at ¶ 11. Guerrero did not see plaintiff in waist restraints in his cell at any time on March 15th. *Id.* If plaintiff had been in restraints, Guerrero would have noticed during the interview. *Id.* Plaintiff claims that he was in restraints when Guerrero came to I-3, that Guerrero "would not listen to plaintiff until plaintiff broke the restraints and attempted to use as a weapon before surrendering the broken restraints." Pl.'s Response No. 46. Plaintiff's claim in his opposition papers that he broke free from the restraints in the early afternoon of March 15th and flushed some pieces of the restraints down the toilet before being removed from his cell (ECF No. 84 at 14, 76) contradicts plaintiff's verified complaint, in which he averred that the restraints were finally removed by officers after he was taken from his cell that day. ECF No. 16 at 17-18.

9

1    Defendants have produced records showing that plaintiff accepted a sack lunch on March
2 15th and ended his hunger strike by taking a bite of bread at 12:40 p.m. ECF No. 78-1 at 15.
3 Plaintiff disputes that he ended his hunger strike at that time and claims that the records show he
4 actually ended it at 5:10 p.m. Pl.'s Response Nos. 46 & 47 (citing ECF No. 85 at 69). The
5 records plaintiff cites do not conflict with defendants' records; in fact, they are the same records.
6 Plaintiff's citation is merely to a note taken later in the day indicating that plaintiff was off his
7 hunger strike. An earlier note in the same document records that plaintiff first went off the strike
8 at 12:40 p.m. ECF No. 85 at 68. Defendant Dichoso declares that, when he gave plaintiff the
9 sack lunch, plaintiff was not in waist restraints. DUF No. 47. Plaintiff disputes that fact. Pl.'s
10 Response No. 51.

11    At 1:30 p.m., defendant Captain Nelson visited I-3 for about 10 minutes to interview an
12 inmate who had just been transferred to the unit. DUF 48; Pl.'s Response No. 48. Nelson does
13 not recall ever meeting plaintiff or being present when plaintiff was removed from his cell. ECF
14 No. 78-9 at ¶ 6. Plaintiff originally averred in his complaint that Nelson ordered the removal of
15 the restraints after plaintiff was removed from his cell and then denied plaintiff's request for
16 medical care. ECF No. 16 at 17-18. Plaintiff now claims that he broke free of the restraints prior
17 to being removed from his cell, but he continues to assert that Nelson denied his request for
18 medical care. ECF No. 84 at 14, 76.

19    Defendant Brown and non-defendant officers Samim and Gilson worked on I-3 on the
20 afternoon of March 15th. DUF No. 53; Pl.'s Response No. 53. That afternoon, an I-3 inmate set
21 a fire in his cell to which multiple officers responded. DUF No. 54; Pl.'s Response No. 54. At
22 the same time, several inmates, including plaintiff, covered their windows. DUF No. 55; Pl.'s
23 Response No. 55. Several officers responded to the covered windows, including Gilson and non-
24 defendant Officer Hurtado. *Id.* Defendants assert that Sgt. Lacebal also responded to the
25 window-coverings, but plaintiff disputes this and claims Lacebal was not in I-3 at the time. *Id.*
26 At around 4 p.m., Officer Hurtado, with help from other officers, removed the window covering
27 on plaintiff's window and recovered a set of broken waist restraints from plaintiff's cell. DUF
28 /////

No. 56; Pl.'s Response No. 56. The parties dispute whether defendant Nelson was present at the time. *Id.*

Defendant Ramirez provides a possible alternative account of how plaintiff came to possess the restraints:

> I remember March 14, 2013, because it was a very unusual day. There were two inmates who threatened to hurt themselves at about the same time that day. I placed the first inmate in the holding cell in our office so that we could summon the doctor to come speak to him. I was going to place the second inmate in another holding cell, but he refused to come out of his cell. While the first inmate was in the office holding cell waiting for the doctor, the first inmate threatened to urinate on the floor if he was not taken back to his cell to use the bathroom. I took the first inmate back to his cell, placed him in his cell and uncuffed one of his hands temporarily so that he could relief himself in his cell toilet while I waited. I was going to take him right back to the office holding cell so he could talk to his doctor in private after he finished, but then he refused to come out [of] his cell. At almost the same time, the second inmate, whose cell was across the hall from the first inmate, threatened to hurt himself. While I would not normally leave a restrained inmate alone in his cell, I was afraid the second inmate might hurt himself if I did not respond to him immediately. As a result, I left the first inmate in his cell to go get some waist restraints so that I could take the second inmate out of his cell and place him in the office holding cell (where the first inmate had been before being returned to his cell to urinate). After placing the second inmate in waist restraints, I took him to the office holding cell, so that he could talk to his doctor, who was on the unit by that time. I then went back to the first inmate to retrieve the waist restraints. When I got to the first inmate's cell, I saw that he was no longer in waist restraints. He told me that another, unidentified officer had removed and retrieved the waist restraints from him. As I was questioning him, I noticed something metal in his cell, and he then surrendered a small padlock to me. Waist restraints consist of a chain that is secured around the inmate's waist with a small padlock and two shorter chains that have a handcuff on each end for each hand. The chain is adjusted so that the short chains for the inmate's hands allow him to rest his arms in front of him or by his side, with a slight bend in each arm. Before I was able to confirm whether the waist restraints had actually been retrieved by another officer, the second inmate, who was still in the office holding cell, had escaped from his restraints and was using the restraints to break a window. I left the first inmate to go deal with the second inmate and I called the watch sergeant. After the sergeant arrived, we were able to place the second inmate in waist restraints and return him to his cell. That inmate then refused orders to release the open food port and I had to use my pepper spray to obtain his compliance and secure the food port. I then followed procedure to decontaminate the second inmate and prepared the necessary paperwork to document that incident, before returning to my regular duties until the end of my shift.

ECF No. 78-7 at ¶ 13. Defendants imply that plaintiff somehow got the broken restraints that he was found with on March 15th (which did not include the padlock) from the first inmate described by Ramirez. DUF No. 56; Pl.'s Response No. 56; ECF No. 90 at 12. Plaintiff disputes

this implication (he says that he flushed some pieces of the restraints, presumably including the padlock, down the toilet), but does not dispute Ramirez's account of his interactions with the other two inmates. ECF No. 84 at 36-48, PUF Nos. 44-46, 48. Plaintiff claims that Officer Jones retrieved the remainder of the restraints from the first inmate during the evening of March 14th. PUF No. 58. Plaintiff argues that Ramirez's interactions with the other two inmates show that: (1) it was his practice to leave inmates in waist restraints in their cells and (2) Ramirez's claim that he would not leave an inmate in restraints unsupervised in a cell because of safety concerns is not credible. PUF 11.

Other than his own declaration and verified complaint, plaintiff's sole item of evidence supporting his claim that he was left in waist restraints from March 14th through March 15th is a declaration executed by fellow I-3 inmate Michael Bell on March 17, 2013. ECF No. 85 at 25-26. Bell avers:

> On 3/11/13 Childs and I started our hunger strike at breakfast by submitting an inmate medical request to Officer Ramirez and the nurse. We both refused all meals and refused to drink water. . . .
>
> On 3/12/13 and 3/13/13, we both refused to come out of our cells until we received our 128-B chrono showing that we were on a hunger strike. On 3/14/13, Officer Ramirez came to my cell and asked if I wanted to go to the B-1 medical clinic. I refused, then Officer Ramirez asked Childs. Childs was taken to B-1 by Officer Dichoso. About 30 minutes later Childs was coming back on the tier. I asked him what happened and he said he refused. I told him I did also. C/O Ramirez and C/O Dichoso locked Childs in his cell and left him in handcuffs and waist restraints. C/O Ramirez was angry with us and other inmates. C/O Ramirez left Miller [in cell number] 317 in the same restraints and pepper-sprayed Horner [in cell number] 330 for no reason. On this day, 3/14/13, C/O Tapiz and Nahavandi were checking cells every hour and Childs was calling them for help. C/O Ramirez was busy dealing with other inmates.
>
> At 2 p.m. 2nd watch officers, C/O Jones and C/O Brown was working [sic]. I remember telling C/O Jones that Childs was left in restraints. C/O Jones said he knew C/O Ramirez messed up today. C/O Jones let me walk to Childs' cell (323) to talk to Childs. Then Sergeant Lacebal talked to me and Childs. C/O Jones said he talked to C/O Ramirez. C/O Jones or C/O Brown didn't do nothing. On 3/15/13 I told the officers, if they don't remove the restraints off Childs I'm going to set my cell on fire and cover my window. Around 2 or 3 p.m. during 3rd watch I covered my window and set my cell on fire to get help for Childs. C/O Brown sounded his alarm and the fire people came, and a lot of C/O's. Once I came out of my cell I told them about Childs. At that time they recovered the cuffs and restraints Childs broke.

*Id.*

1    Defendants argue that Bell's declaration is inadmissible because it does not establish that
2    Bell could actually see into plaintiff's cell from his own cell and contains hearsay. ECF No. 90 at
3    4-5. Plaintiff notes that Bell averred in his declaration that he was allowed to walk the tier and
4    come to plaintiff's cell in the evening of March 14th. PUF No. 59.
5    Defendants have produced evidence that plaintiff was seen by Dr. Pai at around 6 p.m. on
6    the evening of March 15th while in a holding cell. DUF No. 57; ECF No. 78-1 at 78. Dr. Pai
7    noted that plaintiff was sitting in a holding cage comfortably, in no discomfort, and without
8    reporting any medical issues. *Id.*; ECF No. 78-24. Plaintiff disputes that he was seen by Dr. Pai.
9    Pl.'s Response No. 57.
10   Plaintiff was transferred to R.J. Donovan Correctional Facility on March 19, 2013. DUF
11   No. 59; Pl.'s Response No. 59. During his first two weeks at the new prison, plaintiff did not
12   report any injuries or other medical issues related to the incidents he alleges in this suit. DUF No.
13   60; Pl.'s Response No. 60.

### B. General Summary Judgment Principles

15   Summary judgment is appropriate when there is "no genuine dispute as to any material
16   fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary
17   judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant
18   to the determination of the issues in the case, or in which there is insufficient evidence for a jury
19   to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600
20   (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986); *Nw. Motorcycle Ass'n v.*
21   *U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). At bottom, a summary judgment
22   motion asks whether the evidence presents a sufficient disagreement to require submission to a
23   jury.
24   The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims
25   or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, the rule functions to
26   "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for
27   trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R.
28   Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally, under summary

1    judgment practice, the moving party bears the initial responsibility of presenting the basis for its
2    motion and identifying those portions of the record, together with affidavits, if any, that it
3    believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323;
4    *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving party meets
5    its burden with a properly supported motion, the burden then shifts to the opposing party to
6    present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*,
7    477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995).

8    A clear focus on where the burden of proof lies as to the factual issue in question is crucial
9    to summary judgment procedures. Depending on which party bears that burden, the party seeking
10   summary judgment does not necessarily need to submit any evidence of its own. When the
11   opposing party would have the burden of proof on a dispositive issue at trial, the moving party
12   need not produce evidence which negates the opponent's claim. *See, e.g., Lujan v. National
13   Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters
14   which demonstrate the absence of a genuine material factual issue. *See Celotex*, 477 U.S. at 323-
15   24 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a
16   summary judgment motion may properly be made in reliance solely on the 'pleadings,
17   depositions, answers to interrogatories, and admissions on file.'"). Indeed, summary judgment
18   should be entered, after adequate time for discovery and upon motion, against a party who fails to
19   make a showing sufficient to establish the existence of an element essential to that party's case,
20   and on which that party will bear the burden of proof at trial. *See id*. at 322. In such a
21   circumstance, summary judgment must be granted, "so long as whatever is before the district
22   court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is
23   satisfied." *Id*. at 323.

24   To defeat summary judgment the opposing party must establish a genuine dispute as to a
25   material issue of fact. This entails two requirements. First, the dispute must be over a fact(s) that
26   is material, i.e., one that makes a difference in the outcome of the case. *Anderson*, 477 U.S. at
27   248 ("Only disputes over facts that might affect the outcome of the suit under the governing law
28   will properly preclude the entry of summary judgment."). Whether a factual dispute is material is

determined by the substantive law applicable for the claim in question. *Id*. If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

Second, the dispute must be genuine. In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question. Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim. Conclusory allegations, unsupported by evidence are insufficient to defeat the motion. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *Devereaux*, 263 F.3d at 1076. More significantly, to demonstrate a genuine factual dispute, the evidence relied on by the opposing party must be such that a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson*, 477 U.S. at 248, 252. Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility. It believes the opposing party's evidence, and draws inferences most favorably for the opposing party. *See id*. at 249, 255; *Matsushita*, 475 U.S. at 587. Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences. *Am. Int'l Group, Inc. v. Am. Int'l Bank*, 926 F.2d 829, 836 (9th Cir. 1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322). If reasonable minds could differ on material facts at issue, summary judgment is inappropriate. *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). On the other hand, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). In that case, the court must grant summary judgment.

Concurrent with the motion for summary judgment, defendants advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. ECF No. 78-2; *see Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

### C. Analysis

#### 1. Claims against All Defendants

Defendants argue that summary judgment in their favor is appropriate because their evidence (which consists of various prison records and employee declarations) shows that plaintiff was not left alone in his cell in waist restraints from March 14, 2013 through the following day. ECF No. 78-1 at 6-7. Defendants have indeed provided the court with an impressive number of declarations, including those from non-parties, and records in support of their assertion that plaintiff was not left in restraints. Plaintiff, however, has also provided the court with competing evidence: his verified complaint, his declaration, and the declaration of inmate Bell.

Defendants argue that the court should not accept plaintiff's version of the facts because it is "blatantly contradicted by the record." ECF No. 78-1 at 7 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Having reviewed the evidence, the court concludes that it is not as clear-cut as defendants represent. Many declarants do not remember the days involved and aver only that they would have noticed if plaintiff had been in restraints and would have done something about it. *E.g.*, ECF Nos. 78-20 at ¶¶ 5-7; 78-21 at ¶¶ 5-8; 78-23 at ¶¶ 7-11; 78-22 at ¶¶ 9-10, 78-4 at ¶ 10; 78-5 at ¶¶ 8-9, 78-8 at ¶ 9; 78-11 at ¶¶ 15-16, 22; 78-12 at ¶¶ 4-12; 78-16 at ¶¶ 9-12; 78-17 at ¶ 7; 78-19 at ¶ 6. In addition, it is not totally implausible that, if a guard had illegitimately left an inmate in restraints (as plaintiff alleges), that guard's coworkers would not record that fact in the regularly-maintained prison records. The records do note that a set of restraints were missing during the days at issue here. At this stage of the case, the court cannot weigh credibility. Further, the court must view the evidence in the light most favorable to plaintiff and draw all inferences in his favor. Under that standard, summary judgment is not appropriate here.

Defendants urge the court to disregard plaintiff's declaration due to a contradiction between it and plaintiff's verified complaint. In his complaint, plaintiff averred that he remained in restraints until he was removed from his cell on March 15th and defendant Nelson ordered subordinate officers to remove the restraints. In his opposition to the motion for summary judgment, plaintiff now avers that he broke free of the restraints sometime on the 15th before being removed from his cell and flushed some pieces of the restraints down the toilet. Defendants argue that the court should apply the "sham affidavit rule" and conclude that plaintiff cannot create an issue of fact precluding summary judgment through his statements contradicting his earlier, sworn complaint.

> The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. This sham affidavit rule prevents a party who has been examined at length on deposition from raising an issue of fact simply by submitting an affidavit contradicting his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. . . . But the sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment. In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.

*Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012). This case does not present a situation in which the sham affidavit rule may be applied. Plaintiff was not "examined at length" and now seeks to contradict statements made in deposition that would have shown the absence of a material fact. While plaintiff's unexplained change of story about how he eventually got out of the restraints certainly bears on his credibility, and certainly may be probed on cross-examination at trial, the changed story does not appear to be an attempt to create a triable issue because a potential constitutional violation occurred under either set of facts (i.e., if plaintiff freed himself from the restraints on March 15th or if he was freed by officers that day). Defendants may certainly argue at trial that plaintiff's changed facts show that he cannot be believed, but at this stage in the proceedings, the court cannot make credibility determinations. *See Anthony v. County of Sacramento*, 898 F. Supp. 1435, 1452-53 (E.D. Cal. 1995) (finding that "plaintiff's

/////

17

arguably inconsistent statements go to her credibility, which may not be considered on this motion [for summary judgment].").

Defendants also argue that the court cannot rely on inmate Bell's affidavit because "it is highly doubtful that Bell could have seen into plaintiff's cell" and thus he lacks personal knowledge. ECF No. 90 at 4-5. However, Bell avers in his declaration that he was allowed to go to plaintiff's cell on the evening of March 14th and speak with plaintiff. Bell also avers that he could hear plaintiff calling for help and that defendant Jones told Bell that he knew that plaintiff had been left in waist restraints. Defendants argue that Bell's statements about what he heard from his cell are "inadmissible hearsay." ECF No. 90 at 5. Defendants do not explain how the things Bell heard fall within the hearsay rule, however. Plaintiff's statements that were overheard by Bell may fall within the hearsay exceptions of Federal Rule of Evidence 801(d)(1)(B) and defendant Jones's statement may fall within 801(d)(2). Accordingly, the undersigned finds that defendants have not proffered a persuasive argument for disregarding Bell's affidavit.

In sum, defendants have offered an impressive amount of evidence in support of their claim that plaintiff was not left in waist restraints in his cell from March 14th through March 15th, 2013. But plaintiff's evidence (his verified complaint and declaration, along with inmate Bell's declaration) and the undisputed facts (that waist restraints were missing from the unit on the days in question and broken restraints were retrieved from plaintiff when he was removed from his cell on the 15th) are sufficient to establish that this central fact is disputed. For that reason, summary judgment in favor of defendants must be denied.

### 2. Claim against Defendant Nelson

Defendants argue that, even assuming that plaintiff's allegations about being left in restraints are true, there is no evidence that defendant Nelson: (1) was present at the time, (2) denied plaintiff medical care after plaintiff was removed from his cell, (3) was aware of a substantial risk to plaintiff's health or safety, or (4) caused plaintiff any harm. While plaintiff alleged in his complaint that he told Nelson that he was "in a lot of pain" when he was taken from his cell (ECF No. 16 at 18), plaintiff concedes in his summary judgment opposition that his injuries were "minute" and "at most, de minimus." ECF No. 84 at 16. Given this concession, no

factfinder could conclude that plaintiff faced a substantial risk of serious harm from Nelson's alleged denial of immediate medical attention, which is an essential element of plaintiff's claim against him. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Accordingly, summary judgment in Nelson's favor is appropriate.

### III. Conclusion and Recommendation

For the foregoing reasons, it is RECOMMENDED that:

1. Defendants' October 13, 2015 motion for summary judgment (ECF No. 78) be granted as plaintiff's claims against defendant Nelson and otherwise denied; and

2. Plaintiff's May 5, 2016 motion for court intervention (ECF No. 93) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 2, 2016.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE